UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MEHIER TAAMNEH, et al.,

            Plaintiffs,

    v.

TWITTER, INC., et al.,

            Defendants.

Case No. 17-cv-04107-EMC

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS**

Docket No. 62

Plaintiffs are relatives of Nawras Alassaf, a citizen of Jordan who was killed on January 7, 2017, when Abdulkadir Masharipov, an individual affiliated with ISIS, attacked the Reina nightclub in Istanbul, Turkey. Plaintiffs have sued three social media companies, namely, Twitter, Inc.; Google, Inc. (for its YouTube product); and Facebook, Inc. According to Plaintiffs, Defendants have, *e.g.*, provided material support to a terrorist or terrorist organization in violation of the Antiterrorism Act ("ATA"), *see* 18 U.S.C. §§ 2333(a), 2339A, 2339B, 2339C, and aided and abetted and/or conspired with a person who committed an act of international terrorism in violation of the Justice Against Sponsors of Terrorism Act ("JASTA"), which amended the ATA. *See id.* § 2333(d); *see also* 130 Stat. 852 (2016). Currently pending before the Court is Defendants' motion to dismiss Plaintiffs' first amended complaint ("FAC").

Having considered the parties' briefs and the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion to dismiss.

## I.      FACTUAL & PROCEDURAL BACKGROUND

A.    Allegations in FAC

In their FAC, Plaintiffs allege as follows.

ISIS uses Defendants' social media platforms "to promote and carry out its terrorist

activities."  FAC ¶ 11.  For example, ISIS uses Defendants' platforms to do the following.  *See* FAC ¶ 12.

- Recruit.  *See* FAC ¶¶ 142-43 (alleging that "[o]ne of ISIS's primary uses of Defendants' sites is a recruitment platform, particularly to draw fighters from Western countries" and that ISIS recruiters and potential recruits "often communicate via Defendants' Direct Messaging capabilities"); FAC ¶ 144 (alleging that "ISIS members use Defendants to pose instructional guidelines and promotional videos referred to as 'mujatweets'").

- Raise funds.  *See* FAC ¶¶ 153, 155 (alleging that ISIS "uses Defendants to raise funds for its terrorist activities" – *e.g.*, calls for donations are made and donors are asked to contact ISIS).

- Spread propaganda.  *See* FAC ¶ 168 (alleging that "Defendants' platforms enable ISIS to communicate its message directly to intended audiences without having to go through the filter of commercial media").

- Plan terror attacks and give instructions for terror attacks.  *See* FAC ¶ 169; *see also* FAC ¶ 490 (alleging that "[o]ne of the stated goals of ISIS is to use social media including Defendants['] platforms to radicalize individuals to conduct attacks throughout the world, including the United States").

According to Plaintiffs, prior to the Reina attack, "Defendants refused to actively monitor [their] online social media networks" and "generally only reviewed ISIS's use of [their] services in response to third party complaints."  FAC ¶ 402; *see also* FAC ¶¶ 410, 414.  In some instances, even after being alerted, Defendants found that ISIS did not violate their policies and allowed the ISIS-affiliated accounts to remain active.  *See* FAC ¶ 403.  In other instances, after Defendants blocked or suspended ISIS-affiliated accounts, they "did not make substantial or sustained efforts to ensure that ISIS would not reestablish the accounts using new identifiers."  FAC ¶ 404; *see also* FAC ¶ 469 (providing an example of a reestablished account).

Plaintiffs maintain that "Defendants have tools by which [they] can [easily] identify, flag, review, and remove ISIS accounts."  FAC ¶ 463.  *See, e.g.*, FAC ¶ 479 (alleging that "a content-

neutral algorithm could be easily developed that would prohibit" reestablished accounts where the account holder's name was only minimally changed).

On January 1, 2017, ISIS engaged in a terrorist attack at the Reina nightclub in Istanbul, Turkey. Dozens of people were injured or killed. Plaintiffs' family member, Mr. Alassaf, was one of the persons who was killed. *See* FAC ¶ 325.

ISIS's use of Defendants' social media platforms to, *e.g.*, recruit, raise funds, spread propaganda, and plan and execute terror attacks, "has enabled [ISIS] to carry out or cause to be carried out, numerous terrorist attacks," including that on the Reina nightclub. FAC ¶ 12; *see also* FAC ¶ 331 (alleging that "[t]he stated goal of ISIS to use social media, including Defendants' platforms, services, computers, and communications equipment, to assist in carrying out their terrorist attacks throughout the world"); FAC ¶ 333 (alleging that "Defendants' services allow ISIS to carry out its terrorist activities, including recruiting, radicalizing, and instructing terrorists, raising funds, and creating fear").[1]

The Reina attack was carried out by Abdulkadir Masharipov. *See* FAC ¶ 334. Mr. Masharipov was radicalized in the years leading up to the attack. *See* FAC ¶ 341. He was "radicalized by ISIS's use of social media." FAC ¶ 493.

Prior to the attack, there was a year-long coordination and communication between Mr. Masharipov and "Islamic State emir Abu Shuhada." FAC ¶ 334; *see also* FAC ¶ 339 (alleging that, during his interrogation, Mr. Masharipov stated that he was given orders by an Islamic State emir "to travel to Turkey to establish himself, along with his wife and two children, and await further orders"). Approximately a week before the attack, Mr. Shuhada directed Mr. Masharipov to launch the attack. *See* FAC ¶ 343. At some point, ISIS gave Mr. Masharipov footage from inside the Reina nightclub which he "viewed 'over and over' to memorize the floor plan . . . and plan his attack." FAC ¶ 371.

---

[1] In addition, "ISIS used Defendants' platforms to specifically threaten Turkey that it would be attacked for participating in a coalition of nations against ISIS, to celebrate smaller attacks leading up to these major attacks, and to transform the operational lead of the Reina attack into a 'celebrity' among jihadi terrorists in the year leading up to the Istanbul attack via videos featuring his ISIS exploits in Syria, France and Belgium." FAC ¶ 24.

3

There is no indication, however, that ISIS used a social media platform to give Mr. Masharipov that footage. Nor do Plaintiffs allege that Mr. Masharipov used any of Defendants' platforms to communicate with ISIS.

B. Plaintiffs' Theories of Liability

Plaintiffs assert that Defendants provide material support to ISIS, or aid and abet ISIS, in the following ways.

- "Plaintiffs' claims are based not upon the content of ISIS's social media postings, but upon Defendants['] *provision of the infrastructure* which provides material support to ISIS." FAC ¶ 30 (emphasis added). For example, "[t]hrough Defendants' services, Defendants make potential ISIS recruits, members, and leaders[] available to other ISIS operatives, thus providing personnel to ISIS itself." FAC ¶ 401.

- In addition, Plaintiffs assert that Defendants create "unique content by *combining the ISIS postings with advertisements* selected by Defendants based upon ISIS's postings and the viewer looking at the postings and the advertisements." FAC ¶ 32; *see also* FAC ¶ 443 (making general allegations about targeted advertising); FAC ¶ 424 (making allegations about Google); FAC ¶ 438 (making allegations about Twitter); FAC ¶ 439 (making allegations about Facebook). Defendants profit from the targeted advertising. *See* FAC ¶¶ 391-92 (alleging that "each Defendant places ads on ISIS postings and derives revenue from the ad placement" and that the ads are not placed randomly; rather, "they are targeted to the viewer using [a Defendant's] knowledge about the viewer as well as information about the content being viewed").

- Google has gone one step further and *shared revenue* earned from advertising with ISIS. *See* FAC ¶¶ 31, 158, 427, 432 (alleging, *inter alia*, that "YouTube approves of ISIS videos allowing for ads to be placed with ISIS videos" and "YouTube earns revenues from these advertisements and shares a portion of the proceeds with ISIS").

4

- In addition, Google "*recommends content* to users based upon the content and what is known about the viewer. Google has [thus] recommended ISIS videos to users." FAC ¶ 445 (emphasis added; also alleging on information and belief that "this is a common occurrence"). Twitter and Facebook make similar suggestions to a user or viewer. *See* FAC ¶ 459. "Effectively, Defendants serve as a broker or matchmaker between like-minded people, introducing users to other users and videos that they will be interested in based on the video and account information and characteristics." FAC ¶ 460.

- Finally, each Defendant enables an account holder to *distribute information through his or her social network* (*e.g.*, followers, friends, or subscribers or timeline or news feeds) on the social media platform maintained by each Defendant. *See* FAC ¶¶ 453-54.

C.   <u>Causes of Action</u>

Based on, *inter alia*, the above allegations, Plaintiffs assert the following causes of action:

(1) Liability for aiding and abetting acts of international terrorism pursuant to 18 U.S.C. § 2333(a) and (d).

(2) Liability for conspiring in furtherance of acts of international terrorism pursuant to 18 U.S.C. § 2333(a) and (d).

(3) Provision of material support to terrorists in violation of 18 U.S.C. § 2339A and § 2333(a).

(4) Provision of material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B(a)(1) and § 2333(a).

(5) Negligent infliction of emotional distress.

(6) Wrongful death.

(7) Concealment of material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339C(c) and § 2333(a).

(8) Provision of funds, goods, or services to or for the benefit of specially designated

global terrorists in violation of Executive Order No. 13224, 31 C.F.R. Part 594, and 50

U.S.C. § 1705.

## II.    <u>DISCUSSION</u>

A.   <u>Legal Standard</u>

> To survive a [12(b)(6)] motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), [a plaintiff's] factual allegations [in the complaint] "must . . . suggest that the claim has at least a plausible chance of success." In other words, [the] complaint "must allege 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"
>
> . . . . [The Ninth Circuit has] settled on a two-step process for evaluating pleadings:
>
>> First, to be entitled to the presumption of truth, allegations in a complaint or counterclaim may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively. Second, the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.

*Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134-35 (9th Cir. 2014).

Notably,

> [t]he plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility 'of entitlement to relief.'"

*Iqbal*, 556 U.S. at 678.

B.   <u>Relevant Statutes</u>

The ATA makes it a crime to, *inter alia*:

- Provide material support to terrorists. More specifically, 18 U.S.C. § 2339A

  provides in relevant part: "Whoever provides material support or resources or

conceals of disguises the nature, location, source, or ownership of material support

of resources, knowing or intended that they are to be used in preparation for, or in

carrying out, a violation of [certain federal statutes] or in preparation for, or in

carrying out, the concealment of an escape from the commission of any such

violation, or attempts or conspires to do such an act," shall be fined and/or

imprisoned.  18 U.S.C. § 2339A(a).

- Provide material support or resources to designated foreign terrorist organizations.
  More specifically, § 2339B provides in relevant part: "Whoever knowingly
  provides material support or resources to a foreign terrorist organization, or
  attempts or conspires to do so," shall be fined or imprisoned.  *Id.* § 2339B(a)(1).
  "To violate this paragraph, a person must have knowledge that the organization is a
  designated terrorist organization . . . , that the organization has engaged or engages
  in terrorist activity . . . , or that the organization has engaged or engages in
  terrorism . . . ." *Id.*

- Conceal material support or resources to designated foreign terrorist organizations.
  More specifically, § 2339C provides in relevant part: "Whoever . . . knowingly
  conceals or disguises the nature, location, source, ownership, or control of any
  material support or resources, or any funds or proceeds of such funds[,] knowing or
  intending that the support or resources are to be provided, or knowing that the
  support or resources were provided, in violation of section 2339B of this title,"
  shall be fined or imprisoned.  *Id.* § 2339C(c)(2).

While §§ 2339A, 2339B, and 2339C make it a crime to engage in the conduct so

described, civil liability is provided for in § 2333.  More specifically, § 2333(a) provides as

follows:

> Any national of the United States injured in his or her person,
> property, or business by reason of an act of international terrorism,
> or his or her estate, survivors, or heirs, may sue therefor . . . and
> shall recover threefold the damages he or she sustains and the cost
> of the suit, including attorney's fees.

18 U.S.C. § 2333(a).  A violation of the above criminal provisions "can provide the basis for a

7

[civil] cause of action under § 2333(a)." *Fields v. Twitter, Inc.*, 881 F.3d 739, 743 (9th Cir. 2018).

Section 2333(a) of the ATA provides only for primary or direct liability. *See, e.g.*, *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013) (stating that "it does not appear to us that Congress intended § 2333(a) to permit recovery on such a theory [*i.e.*, aiding and abetting]"). However, the ATA does provide for indirect liability, as reflected by § 2333(d)(2). This was part of the JASTA amendment to the ATA.[2] Section 2333(d)(2) (added by JASTA) states as follows:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . , liability may be asserted as to any person who aids *and abets, by knowingly providing substantial assistance, or who conspires* with the person who committed such an act of international terrorism.

*Id.* § 2333(d)(2) (emphasis added).

Finally, independent of the ATA and JASTA, 50 U.S.C. § 1705 provides that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and "[a] civil penalty may be imposed on any person who commits [such] an unlawful act." 50 U.S.C. § 1705(a). In response to the 9/11 terrorist attack, "President George W. Bush issued Executive Order No. 13224 pursuant to the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq. ('IEEPA')." FAC ¶ 62. The Executive Order

> blocked all property and interests in property of "Specially Designated Global Terrorists" ("SDGTs"), prohibited the provision of funds, goods, or services for the benefit of SDGTs, and authorized the U.S. Treasury to block the assets of individuals and entities that provide support, services, or assistance to, or otherwise associate with, SDGTs, as well as their subsidiaries, front organizations, agents, and associates.

FAC ¶ 64. In addition, 31 C.F.R. § 594.204 provides in relevant part as follows:

> Except as otherwise authorized, no U.S. person may engage in any transaction or dealing in property or interests in property of persons

---

[2] *See Siegel v. HSBC Bank USA, N.A.*, No. 17cv6593(DLC), 2018 U.S. Dist. LEXIS 126152, at *8 (S.D.N.Y. July 27, 2018) ("'After JASTA, plaintiffs are not limited to proving their ATA claim on a theory of . . . primary liability.'"). Congress enacted JASTA in September 2016. *See Gonzalez v. Google, Inc.*, No. 16-cv-03282-DMR, 2018 U.S. Dist. LEXIS 138367, at *17 (N.D. Cal. Aug. 15, 2018).

United States District Court
Northern District of California

whose property and interests in property are blocked pursuant to § 594.201(a), including but not limited to the following transactions:

(a) The making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to § 594.201(a).[3]

31 C.F.R. § 594.204(a).

## C.    Federal Claims – Direct Liability

As Defendants note, Plaintiffs' federal claims assert both direct liability and indirect liability. The direct liability claims are as follows:

- Third claim for relief: Provision of material support to terrorists in violation of 18 §§ 2339A and 2333(a).

- Fourth claim for relief: Provision of material support to a designated foreign terrorist organization in violation of §§ 2339B and 2333(a).

- Seventh claim for relief: Concealment of material support and resources to a designated foreign terrorist organization in violation of §§ 2339C and 2333(a).

- Eighth claim for relief: Provision of funds, goods, or services to or for the benefit of specially designated global terrorists in violation of Executive Order No. 13224, 31 C.F.R. Part 594, and 50 U.S.C. § 1705.

The first three claims above are all predicated on the ATA (*i.e.*, § 2333(a)). Although the last claim is predicated on a different federal law (§ 1705), Defendants argue – and Plaintiffs do not disagree – that the same analysis applies to all of the claims with respect to the issues addressed herein. Therefore, the Court focuses on the ATA claims.

Defendants argue for dismissal of the ATA claims on two grounds: (1) Plaintiffs have not plausibly alleged proximate causation, and (2) Plaintiffs have not plausibly alleged that Defendants committed an "act of international terrorism." The Court need only address the first argument.

The ATA's direct liability provision states as follows: "Any national of the United States

---

[3] Title 31 C.F.R. § 594.201 covers prohibited transactions involving blocked property. Section 594.201(a) provides that property and interests in property of, *e.g.*, terrorists are blocked and cannot be transferred.

9

injured in his or her person, property, or business *by reason of* an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor . . . and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees." 18 U.S.C. § 2333(a) (emphasis added).

In *Fields*, the Ninth Circuit addressed what is meant by the phrase "by reason of an act of international terrorism." It began by noting that the "'by reason of' language requires a showing of proximate causation." *Fields*, 881 F.3d at 744. It rejected the plaintiffs' contention that "proximate causation is established under the ADA when a defendant's 'acts were a substantial factor in the sequence of responsible causation,' and the injury at issue 'was reasonably foreseeable or anticipated as a natural consequence.'" *Id.* Instead, it held that, "to satisfy the ATA's 'by reason of' requirement, a plaintiff must show at least *some direct relationship* between the injuries that he or she suffered and the defendant's acts."[4] *Id.* (emphasis added).

The court noted that the "by reason of" language has been used in other contexts, *e.g.*, the Sherman and Clayton Acts and RICO, and inferred that "Congress intended these words to 'have the same meaning that courts had already given them' in those contexts." *Id.* Proximate cause under those statutes have been construed to require some direct relationship. *See id.* (citing, *e.g.*, *Holmes v. Securities Investor Protection Corporation*, 503 U.S. 258 (1992) (RICO)). In addition,

> the same three reasons that compelled the [Supreme Court] to adopt the Clayton Act's "some direct relation" requirement in the RICO context now motivate us to adopt that requirement in the context of the ATA. As relevant here, the conduct the ATA prohibits is the provision of material support to international terrorists. Not requiring that this provision of support have some direct relation to a plaintiff's injuries (1) would make it extremely difficult to attribute damages to the provision of material support as distinct from other intervening factors, (2) would force courts to develop complicated damages-apportionment rules to avoid multiple recoveries, and (3) would create these difficulties needlessly, because victims injured

---

[4] The D.C. Circuit has declined to follow the Ninth Circuit. It has held that, "[t]o survive a motion to dismiss for failure to state a claim, Plaintiffs . . . must plausibly allege (1) [the defendant's] acts were a substantial factor in the sequence of events that led to their injuries and (2) that those injuries must have been reasonably foreseeable or anticipated as a natural consequence of [the defendant's] conduct." *Owens v. BNP Paribas, S.A.*, No. 17-7037, 2018 U.S. App. LEXIS 20881, at *9-10 (D.C. Cir. July 27, 2018). The D.C. Circuit acknowledged that, in *Fields*, "[t]he Ninth Circuit suggested that [the] direct-relation requirement might represent a 'higher' standard for proximate causation" but added, "We are not so sure." *Id.* at *10 n.8.

more directly by the provision of material support would not be prevented from recovery by a "direct relation" requirement.

*Id.* at 746; *cf. Bank of Am. Corp. v. City of Miami*, 197 L. Ed 2d 678, 690 (2017) (holding that "proximate cause under the [Fair Housing Act] requires 'some direct relation between the injury asserted and the injurious conduct alleged'"; quoting *Holmes*).

The Ninth Circuit noted that it was not "hold[ing] that a consideration of foreseeability is irrelevant to, or never required, in a proximate cause analysis"; "foreseeability is another of the 'judicial tools' in the proximate cause toolshed." *Fields*, 881 F.3d at 747. But, "for purposes of the ATA, it is a direct relationship, rather than foreseeability, that is required." *Id.* at 748. The court was "troubled by the seemingly boundless litigation risks that would be posed by extending the ATA's bounds as far as foreseeability may reach," especially as "[c]ommunication services and equipment are highly interconnected with modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct." *Id.* at 749.

Turning to the facts of the case before it, the Ninth Circuit held that the plaintiffs failed to adequately plead proximate causation.

> Here, Plaintiffs-Appellants have not pleaded that Twitter's provision of communication equipment to ISIS, in the form of Twitter accounts and direct messaging services, had any direct relationship with the injuries that Plaintiffs-Appellants suffered. At most, the SAC establishes that Twitter's alleged provision of material support to ISIS facilitated that organization's growth and ability to plan and execute terrorist acts. But the SAC does not articulate any connection between Twitter's provision of this aid and Plaintiffs-Appellants' injuries. Rather, as the district court noted,

> the allegations in the SAC do not support a plausible inference of proximate causation between Twitter's provision of accounts to ISIS and the deaths of Fields and Creach. *Plaintiffs allege no connection between the shooter, Abu Zaid, and Twitter.* There are no facts indicating that Abu Zaid's attack was in any way impacted, helped by, or the result of ISIS's presence on the social network.

*Id.* at 749-50 (emphasis added).[5]

_____

[5] In their opposition, Plaintiffs criticize *Fields*, *see, e.g.*, Opp'n at 13 (arguing that "the Ninth Circuit's assumption – that Congress must have assigned the same meaning to the phrase 'by

11

The instant case is somewhat different from *Fields* in that, here, Plaintiffs have made one allegation suggesting that Mr. Masharipov's attack was in one way causally affected by ISIS's presence on the social platforms. Specifically, Plaintiffs allege that Mr. Masharipov was "radicalized by ISIS's use of social media." FAC ¶ 493. However, this conclusory allegation is insufficient to support a plausible claim of proximate causation. *See Iqbal*, 556 U.S. at 681 (noting that conclusory allegations are not entitled to be assumed true).

Plaintiffs do not allege that Mr. Masharipov ever saw any specific content on social media related to ISIS. Nor are there even any factual allegations that Mr. Masharipov maintained a Facebook, YouTube, and/or Twitter account. Furthermore, there are allegations in the complaint suggesting that there were other sources of radicalization for Mr. Masharipov. *See, e.g.*, FAC ¶ 337 (alleging that Mr. Masharipov "had previously received military training with *al-Qaeda* in Afghanistan in 2011"); *see also Iqbal*, 556 U.S. at 678 (stating that, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief"'"). Finally, a direct relationship is highly questionable in light of allegations suggestive of intervening or superseding causes – in particular, Plaintiffs have alleged that, after becoming radicalized, Mr. Masharipov would have a "year-long communication and coordination [with] Islamic State emir Abu Shuhada" to carry out the Reina attack. FAC ¶ 334. Moreover, Plaintiffs fail to allege any clear or direct linkage between Defendants' platforms and the Reina attack.

Notably, at least one other court has rejected a claim of proximate causation problem even in the face of similar allegations that the person who carried out the terrorist attack had been radicalized through social media. In *Pennie v. Twitter, Inc.*, 281 F. Supp. 3d 874 (N.D. Cal. 2017) – a case decided before *Fields* – the plaintiffs filed an ATA suit against Twitter, Google, and Facebook after a mass shooting in Dallas, Texas, during which five police officers were killed.

---

reason of' as when it enacted antitrust and antiracketeering legislation – contravenes the ATA's purpose"), but the case is binding precedent on this Court.

Moreover, JASTA's amendment to the ATA is immaterial because Defendants are simply making a proximate cause argument on Plaintiffs' direct liability claims, and not their indirect liability claims (with only the latter being covered by JASTA).

The "general premise" of the plaintiffs' complaint was that the defendants "have provided material support to Hamas by allowing Hamas and its members and affiliates to use Defendants' social media platforms." *Id.* at 877. The plaintiffs alleged, *inter alia*, that the shooter "'was radicalized, in part, by reviewing postings of HAMAS and other terrorist groups on the internet and Defendants' social media sites.'" *Id.* at 877.

Judge Spero held that the above allegation was

> comparable to allegations at issue in *Iqbal*, where the Supreme Court held too conclusory to be cognizable allegations that governmental defendants subjected the plaintiff to harsh confinement on account of his religion, race, or national origin, "that [then-Attorney General] Ashcroft was the 'principal architect' of this invidious policy, and that [then-FBI Director] Mueller was 'instrumental' in adopting and executing it." Absent any factual allegations regarding the Hamas postings that [the shooter] allegedly viewed and their relationship to the shooting, the assertions here that Hamas radicalized [the shooter] are both too conclusory to be taken as true and too vague to establish proximate cause.

*Id.* at 887 n.8. Significantly, Judge Spero reached this conclusion even applying the plaintiffs' broad definition of proximate cause (*i.e.*, substantial factor), *see id.* at 886, and not the more limited definition of proximate cause endorsed by the Ninth Circuit in *Fields*.[6]

Judge Spero also noted that "[t]he only specific organizations that Plaintiffs allege [the shooter] interacted with using Defendants' services are [non-Hamas] groups whose Facebook pages he 'liked' – the New Black Panther Party, the Nation of Islam, the Black Riders Liberation Army, and the African American Defense League." *Id.* at 887.

Finally, Judge Spero held that the plaintiffs could not cure the proximate cause deficiency through an amendment:

> Plaintiffs' counsel suggested at the hearing that Plaintiffs could amend their complaint to allege that groups [the shooter] "liked" on Facebook had contact with Hamas. But Plaintiffs concede that

---

[6] *Cf. Owens*, 2018 U.S. App. LEXIS 20881, at *17-18 (stating that, "in order to satisfy proximate causation under the ATA, Plaintiffs' complaint needs to adequately plead facts alleging that [the defendant bank] *substantially* contributed to Plaintiffs' injuries because the funds to Sudan [a state sponsor of terrorism] 'actually [were] transferred to al Qaeda . . . and aided in' the embassy bombings"; plaintiffs' conclusory allegations that "the Sudanese banks transmitted the funds from [the defendant bank] directly to al Qaeda and that these funds from [the defendant bank] were necessary for al Qaeda to carry out the embassy bombings" were not insufficient) (emphasis in original).

13

> Hamas never directly communicated with [the shooter], and that they do not know whether [he] ever viewed Hamas social media content. Plaintiffs have not suggested that they could allege that Hamas instructed or encouraged groups like the New Black Panther Party to foment the sort of attack that [the shooter] committed, nor that [he] viewed material from those groups calling for such an attack. An amended allegation that Hamas at some point communicated with radical groups that [the shooter] "liked" on Facebook would not establish that Hamas was responsible for [the shooter's] attack on police officers in Dallas.

*Id.* at 888.

The Court agrees with Judge Spero's analysis and finds it equally applicable to the direct liability claims in the instant case. Accordingly, Defendants' motion to dismiss the direct liability claims is granted. The dismissal is with prejudice. Previously, the Court stayed proceedings in the instant case because the Ninth Circuit was deciding *Fields*; after *Fields* was decided, Defendants moved to dismiss, arguing, *inter alia*, a failure to adequately plead proximate cause based on *Fields*. Plaintiffs responded by filing their FAC, which was their opportunity to address any deficiency in proximate cause. At the hearing, Plaintiffs rested their argument on their legal interpretation of proximate cause and did not suggest they could amend the complaint to allege materially different facts. Plaintiffs did not contend, for instance, that they could allege Mr. Masharipov viewed ISIS materials or communicated with ISIS through any of Defendants' social platforms. Because Plaintiffs' FAC still does not adequately plead proximate cause for the direct liability claims, dismissal with prejudice is warranted. *See Crosby v. Twitter, Inc.*, 303 F. Supp. 3d 564, 580 (E.D. Mich. 2018) (dismissing all claims with prejudice).

D.    Federal Claims – Indirect Liability

In addition to federal direct liability claims, Plaintiffs also bring federal indirect liability claims – *i.e.*, JASTA claims. As noted above, § 2333(d)(2) provides as follows:

> In an action under subsection (a) for an injury arising from *an act of international terrorism* committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which *such act of international terrorism* was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed *such an act of international terrorism*.

18 U.S.C. § 2333(d)(2) (emphasis added). Plaintiffs' JASTA claims are as follows:

- First claim for relief: Aiding and abetting acts of international terrorism pursuant to 18 U.S.C. § 2333(a) and (d).
- Second claim for relief: Conspiring in furtherance of acts of international terrorism pursuant to 18 U.S.C. § 2333(a) and (d).

Plaintiffs have expressly tied their aiding/abetting and conspiracy claims to ISIS, and not Mr. Masharipov – *i.e.*, Defendants allegedly aided/abetted ISIS's acts of international terrorism and/or conspired with ISIS who committed acts of international terrorism, both in violation of JASTA. *See* Opp'n at 15-16.

As an initial matter, the Court notes that it has concerns about Plaintiffs' JASTA claims because Plaintiffs seem to take the position that, in the instant case, ISIS's "act of international terrorism" encompasses *all* of ISIS's terrorist operations, and not the Reina attack specifically. But it is questionable that this is what Congress intended because that could effectively transform JASTA, § 2333(d)(2), into a statute that provides for liability for aiding/abetting or conspiring with a foreign terrorist organization generally. *See* Docket No. 74 (Tr. at 21) (Plaintiffs' counsel arguing that, with JASTA, Congress intended "to make it that anybody *who helps a terrorist organization* should be held accountable") (emphasis added). If Congress had so intended, it could easily have used language similar to that in the ATA, § 2339B, but it did not do so. *See* 18 U.S.C. § 2339B (targeting "[w]hoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so").

Instead, Congress chose to refer to aiding/abetting or conspiring with a person who committed "an act of international terrorism," not aiding and abetting or conspiring with a foreign terrorist organization. *Cf. Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (noting that "aiding and abetting an *act* of international terrorism [JASTA, § 2332(d)(2)] requires more than the provision of material support to a designated terrorist *organization* [ATA, § 2339B]") (emphasis in original). As noted above, JASTA provides:

> In an action under subsection (a) for an injury arising from *an act of international terrorism* committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which *such act of*

> *international terrorism* was committed, planned, or authorized,
> liability may be asserted as to any person who aids and abets, by
> knowingly providing substantial assistance, or who conspires with
> the person who committed *such an act of international terrorism.*

18 U.S.C. § 2333(d)(2) (emphasis added). This language indicates that the injury at issue must have arisen from "*an act* of international terrorism" and that the secondary tortfeasor assisted the principal tortfeasor in committing "*such an act* of international terrorism" (emphasis added). JASTA does not refer to assisting a foreign terrorist organization generally or such an organization's general course of conduct. Notably, this understanding of JASTA is consistent with both *Crosby*, 303 F. Supp. 3d at 564, and *Siegel v. HSBC Bank USA, N.A.*, No. 17cv6593(DLC), 2018 U.S. Dist. LEXIS 126152 (S.D.N.Y. July 27, 2018). *See Crosby*, 303 F. Supp. 3d at 573 (stating that plaintiffs "have not alleged any facts that plausibly suggest that any of the defendants [alleged secondary tortfeasors] 'aided or abetted' the person (Mateen) who committed *the night club attack*") (emphasis added); *Siegel*, 2018 U.S. Dist. LEXIS at *12 (stating that, "[e]ven if the TAC [third amended complaint] alleged that services the defendants [alleged secondary tortfeasors] provided to ARB directly supported AQI and al-Qaeda, . . . that would be insufficient[;] [t]he TAC does not allege that the defendants were generally aware that they were playing a role *in the November 9 Attack*") (emphasis added). And requiring secondary liability to be connected with a specific crime would be consistent with the common law's understanding of aiding and abetting. *See, e.g.*, *United States v. Hernandez-Orellana*, 539 F.3d 994, 1006-07 (9th Cir. 2008) (discussing "the classic common law elements of aiding and abetting"; "[a]iding and abetting the commission of a specific crime, we have held, includes four elements: (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent to commit the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that the principal committed the underlying offense").

But even if Plaintiffs were correct that a JASTA claim is viable based on a defendant's assistance of a foreign terrorist organization or such an organization's general course of conduct, the specific allegations made in the complaint fail to establish liability under JASTA. In *Linde*, the Second Circuit noted that

> Congress, in enacting JASTA, instructed that the "proper legal framework for how [aiding and abetting] liability should function" under the ATA is that identified in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). In *Halberstam*, the District of Columbia Circuit observed that, in the civil context, aiding and abetting liability requires proof of three elements: (1) "the party whom the defendant aids must perform a wrongful act that causes an injury," (2) "the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance," and (3) "the defendant must knowingly and substantially assist the principal violation."

*Linde*, 882 F.3d at 329. In the instant case, Plaintiffs have failed to adequately allege the second and third elements above.

Regarding the second element – *i.e.*, the intent element – the *Linde* court explained that a plaintiff does not have to show that the defendant knew of the specific attack at issue, but that the plaintiff does have to show more than just a defendant's knowledge of the foreign terrorist organization's connection to terrorism. *See id.* at 329-30. More specifically, the plaintiff must show that the defendant intended to further the organization's terrorist activities or at least was "'generally aware'" that, through its actions, the defendant "was thereby playing a 'role' in [the organization's] violent or life-endangering activities." *Id.* at 329. And, the court underscored, playing a role in a foreign terrorist organization's activities is more than just providing material support to such an organization. *See id.* (noting that "aiding and abetting an *act* of international terrorism requires more than the provision of material support to a designated terrorist *organization*[;] [a]iding and abetting requires the secondary actor to be 'aware' that, by assisting the principal, it is itself assuming a 'role' in terrorist activities") (emphasis in original). For example, if a defendant bank were to learn that transfers it had been asked to make constituted payments for suicide bombings, that could support a finding that "the bank was aware that by processing future transfers it was playing a role in violent or life-endangering acts whose apparent intent was to intimidate or coerce civilians or to affect a government." *Id.* at 330.

Here, Plaintiffs have failed to adequately allege that Defendants were generally aware that, through their actions, they were playing or assuming a "role" (as required in *Linde*) in ISIS's terrorist activities. There is no allegation, for example, that Defendants knew that ISIS members

17

had previously used Defendants' platforms to communicate specific plans to carry out terrorist attacks. Defendants' purported knowledge that ISIS previously recruited, raised funds, or spread propaganda through Defendants' platforms that is more akin to providing material support to a foreign terrorist organization than assuming a role in terrorist activities.

Finally, even if the intent element were satisfied, the third element of aiding and abetting liability requires "substantial assistance" on the part of the defendant.

> [F]actors relevant to determining "how much encouragement or assistance is substantial enough" [include] (1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance.

*Id.* at 329; *see also id.* at 330-31 (noting that, while "[c]ausation focuses on the relationship between an alleged act of international terrorism and a plaintiff's injury," "aiding and abetting focuses on the relationship between the act of international terrorism and the secondary actor's alleged supportive conduct").

In the instant case, there are insufficient allegations of substantial assistance given that, as discussed above, there are insufficient allegations that Defendants played a role in any particular terrorist activities. And no reasonable jury could find substantial assistance taking into account the six factors above. For example, in *Halberstam*, the D.C. Circuit indicated that, for factor (2), *i.e.*, the amount and kind of assistance given the principal wrongdoer, the assistance given by the defendant should play a "major part in prompting the tort" or be "integral" to the tort in order to be considered substantial assistance. *Halberstam*, 705 F.2d at 484. Here, Plaintiffs have failed to allege that Defendants played a major or integral part in ISIS's terrorist attacks; for example, there are no allegations that ISIS has regularly used Defendants' platforms to communicate in support of terrorist attacks. Also, for factor (4), *i.e.*, the defendant's relation to the principal wrongdoer, the *Halberstam* court indicated that a close relationship or a relationship where the defendant had a position of authority could weigh in favor of substantial assistance. *See id.* Here, there is no real dispute that the relationship between Defendants and ISIS is an arms'-length one – a market relationship at best. Rather than providing targeted financial support, *cf. Linde*, 882 F.3d at 330

(indicating that a jury might be able to find substantial assistance where bank provided financial services and there was some evidence that, before the attacks at issue, the bank that "the transfers being requested therein were payments for suicide bombings"), Defendants provided routine services generally available to members of the public. *Cf. Crosby*, 303 F. Supp. at 577 (in analyzing ATA claim pursuant to § 2339B for material support, stating that "the failure to allege facts to show knowledge of a foreseeable connection to terrorist acts is fatal to the material support claims, particularly where the only allegations of the amended complaint are that defendants provided 'routine' services knowingly only generally that some (unidentified) users could be affiliated with terrorism"). As to factor (5), *i.e.*, the defendant's state of mind, the *Halberstam* court indicated that, where the defendant "showed he was one in spirit" with the principal wrongdoer, *id.*, that could also weigh in favor of substantial assistance. *Cf. NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 920 (1982) (noting that, "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals and that the individual held a specific intent to further those illegal aims"). But here there is no allegation that Defendants have any intent to further ISIS's terrorism.

For all of the foregoing reasons, the Court dismisses the JASTA claims. As above, the dismissal is with prejudice as Plaintiffs did not indicate that they could plead additional allegations to support the aiding-and-abetting or conspiracy claims.

E. State Claims

This leave only Plaintiffs' state claims, which are negligent infliction of emotional distress and wrongful death. As with the federal direct liability claims, Defendants argue that Plaintiffs have failed to adequately allege proximate cause.[7] Defendants are correct, even if the proximate

---

[7] A wrongful death claim can be based on a negligence theory or an intentional tort theory. *See* Cal. Code of Civ. Proc. § 377.60 (providing that "[a] cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf"). Although there are allegations in the FAC that suggest Plaintiffs have asserted an intentional tort theory, *see* FAC ¶ 536 (alleging that "Defendants['] actions were undertaken willfully, wantonly, maliciously and in reckless disregard for Plaintiff's rights" and thus seeking punitive damages), Plaintiffs, in their opposition brief, have not challenged Defendants' characterization of the wrongful death claim as one that sounds in negligence only.

cause standard for state law is more forgiving that the proximate cause standard for an ATA claim. *See, e.g.*, CACI 440 (in negligence jury instructions, stating that "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm[;] it must be more than a remote or trivial factor"). As discussed above, although Plaintiffs allege that Mr. Masharipov was radicalized through Defendants' social media networks, that allegation is entirely conclusory in nature and fails to establish proximate cause even under the more lenient standard. *See Pennie v*, 281 F. Supp. 3d at 886.

The state claims are therefore dismissed, and with prejudice. At the hearing, Plaintiffs made no attempt to argue that they could make additional allegations that would cure the proximate cause deficiency.

## III.     <u>CONCLUSION</u>

For the foregoing reasons, the Court grants Defendants' motion in its entirety and orders the Clerk of the Court to enter a final judgment in Defendants' favor in accordance with this opinion. The Clerk of the Court shall also close the file in this case.

This order disposes of Docket No. 62.

**IT IS SO ORDERED**.

Dated: October 29, 2018

_____
EDWARD M. CHEN
United States District Judge